Filed 8/26/14  In re D.P. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| **In re D.P. et al., Persons Coming Under the Juvenile Court Law.** | **B251966**<br>**(Los Angeles County**<br>**Super. Ct. No. CK99140)** |
| **LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,**<br><br>     **Plaintiff and Respondent,**<br><br>     **v.**<br><br>**Y. P.,**<br><br>     **Defendant and Appellant.** | |

        APPEAL from an order of the Superior Court of Los Angeles County.  Amy Pellman, Judge.  Affirmed.

        Christopher R. Booth, under appointment by the Court of Appeal for Defendant and Appellant.

        John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and Kimberly Roura, Deputy County Counsel for Plaintiff and Respondent.

        No appearance for Minors.

* * * * * * *

In this appeal, Y. P. (father), the father of D.P. and J.P., claims the juvenile court's jurisdictional and dispositional orders under Welfare and Institutions Code[1] section 300 are not supported by sufficient evidence. Father also challenges the juvenile court's inclusion of the children in a restraining order protecting their mother, E.L.,[2] (mother) and an order requiring father's visits be monitored. We affirm the orders in all respects.

## FACTUAL AND PROCEDURAL BACKGROUND

The family came to the juvenile court's attention on April 24, 2013, when the Los Angeles County Department of Children and Family Services (the department) filed a section 300 petition on behalf of D.P. (nine years old) and J.P. (seven years old). As sustained, the petition alleged father has a history of engaging in violent altercations with mother in the presence of the children. On a prior occasion, father struck mother in J.P.'s presence, and struck and broke a kitchen faucet with a meat cleaver also in J.P.'s presence. Father threw a chair to the ground breaking the chair. Father pushed household items off of the kitchen counter and threw a can of juice at mother. On a prior occasion, father struck and broke the windows of the family vehicles with a sledgehammer. On March 28, 2013, father threatened to harm mother while both children were present. Father's violent conduct against mother endangers the physical health and safety of the children, placing them at risk of physical harm.

The petition also alleged that father has a substantial history of substance abuse, and his current alcohol abuse renders him incapable of providing regular care and supervision for the children. On March 28, 2013, and on numerous prior occasions, father was under the influence of alcohol while the children were in father's care and supervision. Mother knew of father's alcohol abuse and due to her victimization, failed to protect the children. The children were at risk of harm from father's substance abuse and mother's failure to protect them.

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2]    Mother is not a party to this appeal.

The petition further alleged father has mental and emotional problems, including suicidal ideation, which rendered him incapable of providing regular care and supervision of the children. On March 28, 2013, father expressed suicidal ideation in the presence of the children. Father was hospitalized for evaluation and treatment of his psychiatric condition. Father failed to take his psychotropic medication as prescribed. Father's mental and emotional condition endangers the children's physical health and safety placing them at risk of harm.

The detention report stated that the children were in mother's custody and care. On March 28, 2013, the department received a referral of emotional abuse and severe neglect of the children by father. It was reported that father had a chronic drinking problem. Father was the perpetrator of domestic violence against mother. Father was transported by the Vernon Police Department to College Hospital in Cerritos for a mental health evaluation and detox after he threatened to kill himself at his place of business. Father was held for evaluation under Health and Safety Code section 5150.

In an interview on March 30, 2013, mother reported that father is a chronic alcoholic, who has anger issues. Mother only met father three times before they were married in Hong Kong. Mother said father had not physically assaulted her during their 10-year marriage. However, father was verbally abusive on numerous occasions throughout their marriage. Mother reported that father had a drinking problem since the very beginning of their marriage. She found out later that he had been drinking since he was 15 years old. Mother said father had extreme mood swings and she was afraid he may be bipolar although he was not formally assessed. Mother said she felt like a single parent for several years because of father's drinking problem.

Mother stated there were two unforgettable incidents when father was not able to control his anger and was destructive to personal property. Three years prior to the interview, father, who was drunk and angry, called mother a pig. When mother responded that father was drunk, he became upset and threw a can of juice at her. The can missed her and hit a pillar next to her. Father then grabbed their son's highchair and slammed it on the floor, breaking it into pieces. Father then went to the kitchen counter

3

and pushed plates and other items off of the counter. Father subsequently grabbed a meat cleaver and stood next to mother with his right hand raised above his head as though he was going to strike her. When mother said, "'Go ahead, [whack] me,'" father became angrier and swung the cleaver at the kitchen faucet, breaking it. J.P. was present during this incident.

Mother also stated that, in January 2012, father came home intoxicated from a social meeting. When father wanted to go out again, mother offered to drive him. However, father became angry, walked out to the garage, grabbed a sledgehammer and in a rage proceeded to smash the front and back windows of their two cars. Mother attempted to call 911, but paternal aunt Jessica P., stopped mother from calling.

According to mother, after this incident, father was willing to see Pansy, a Mandarin speaking licensed therapist, for alcohol addiction and anger management issues. However, after only two months, father refused therapy and denied he had a drinking problem. According to father, he and mother went to Pansy, who was a therapist from their church, over *their* issues. Pansy told father that his issues were not serious enough for him to enroll in an alcohol addiction treatment program. Pansy saw them three or four times *for couples counseling sessions*. According to father, they stopped seeing her because they were busy with their business.

Mother reported that the summer of 2012 was "severe enough" that she took the children out of the home on the pretense of going on a vacation for three weeks.

Mother described the March 2013 incident in which father was hospitalized. Mother went to pick up the children from school and then to pick up father at their place of business. Mother found father intoxicated and acting strangely. He was sitting behind his desk in a darkened office. There was a knife slightly exposed from the sheath on top of the desk. Mother said father was extremely drunk. Father grabbed the knife and opened the blade and in his intoxicated state said something like "'killing.'" Father began yelling at mother and the children in Taiwanese. Mother called 911 because she was afraid that he was threatening to kill himself and mother was afraid for the safety of the children. As father was being taken away, father yelled at her, "'I'm going to get

4

you! You're going to pay for this!'" Mother was later told father had a blood-alcohol level of over .300. Father also attempted to escape from the police officer when they reached the hospital.

Mother stated that she was afraid for the safety of the children and herself and would file for a restraining order. The social worker and mother developed a safety plan for mother to move to a hotel or a friend's home when father was released from the hospital.

Paternal aunt, Flora P., called the social worker to inquire about father. Flora P. said she was willing to provide for father when he was discharged from the hospital until a team decision making meeting (TDM) was held on April 11, 2013.

D.P. said that he did not see or hear anything that occurred on March 28, 2013. D.P. reported that he was not afraid of his parents. He had heard father yell at mother but did not know what father yelled because father spoke in Taiwanese.

J.P. reported he had seen father drunk, including on the day father was taken away after police and a fire truck came. J.P. said he was not afraid of mother "but was afraid a little" of father because of father's drinking. When J.P. was asked if he ever saw father hit mother, J.P. hesitated. J.P. then replied that he heard father yell at mother when they thought he was asleep. J.P. reported seeing father hit mother. With the exception of father being drunk, J.P. had not seen his parents using drugs.

Father was interviewed in Mandarin on April 11, 2013. Father stated that he and mother had a fight about business on March 27, 2013, before he got drunk. They were driving home in a company car. After the fight, mother left father alone at their place of business where he stayed until the next day. At approximately 2:00 p.m. on March 28, 2013, mother sent father a text message asking for a divorce. Father said he became very upset and went out to get some beers and started drinking while watching a video movie. At approximately 3:00 to 4:00 p.m., mother and children came to pick up father. Father said that, because the company had been broken into before, when he heard a knock on the door, he picked up a four-inch knife, which was used as decoration for self-defense. Father said he could not remember what happened and whether he had the knife and kept

5

making stabbing motions toward his neck as reported. Father said that all he remembered was he saw mother come to the office as he was watching the movie.

Father said that, upon discharge from College Hospital, he was told to see a psychiatrist, which he did. On April 6, 2013, father met with Dr. Ching Hsing Shih, who prescribed for father two psychotropic medications which father had not taken.

Father said he believes mother has a history of depression that he learned about from a maternal grandparent after they had been married for a year. Father said he suspected mother takes an antidepressant which she hid from him. He thought she put the medication in a high blood pressure medication bottle. Father said mother is unable to think straight, has difficulty sleeping and stays up very late every night, which he thought was caused by her depression.

Father said that he and mother had on and off business conflicts with each other. They had several verbal arguments. Father said that he counted on mother to run their business but because of her mood swings and inability to think straight, they missed several good business opportunities. This upset father and always ended up with an argument. Father said they loved each other but did not know how to communicate well with each other.

Father denied that he was a drunk and said he only drinks socially. He claimed mother exaggerated the whole thing. Father said that, on one occasion, he had a can of beer and waited for four to five hours before driving the children.

The department attached to the detention report a Vernon Police Department report, which was a follow-up to the initial referral. The police report stated father was involuntarily committed because he was so intoxicated he could not care for himself and was making statements that he was going to commit suicide. Father had a knife and was making stabbing motions toward his neck while mother and children were present. The police report also stated father had raped his wife and would drive the children while he was drunk.

In an interview with mother on April 2, 2013, mother told a police officer that, on the day of the incident, she initially did not bring the children into the office because she

6

knew father was drunk. Father appeared to be drunk and could not move. Mother moved him into the office, placed him in a chair and then went to bring in the children. Mother denied that father grabbed the knife and placed it near his neck. She said father was verbally abusive towards her and the children.

J.P. told the officer that he did not remember what happened on the day of the incident. J.P. recalled father yelling, but he did not understand what father was saying.

D.P. said he remembered father being drunk and yelling at mother. D.P. said drunk is when father "drinks a lot of alcohol." On the day of the incident, D.P. remembered father being really drunk and yelling at mother. D.P. did not understand what father was saying because the argument was in Taiwanese.

During the April 11, 2013 TDM, a safety plan was developed in which father was to participate in an outpatient alcohol program and have monitored visits with the children. The social worker provided father with referrals. The department detained the children from father on April 19, 2013.

On April 24, 2013, mother filed a request for a restraining order against father in the juvenile court. In the description of father's conduct in support of the application, mother said father had sexually assaulted her and forced her to engage in sexual intercourse against her will. Mother stated she had been "chronically verbally abused in front of the [children]." Six months ago, father engaged in ongoing drunk driving with her in the car. Father used a sledgehammer on the cars in January 2012. On the day the temporary restraining order expired, father threatened mother. While father was in the emergency room, he said in front of others, "'I'm going to get you' and 'You are going to pay for this!'"

At the detention hearing on April 24, 2013, the juvenile court granted mother's temporary restraining order protecting mother against father. The temporary restraining order was extended several times. Also at the detention hearing, the court made findings against father and ordered the children released to mother. The department was ordered to provide referrals for father for domestic abuse, alcohol and drug counseling and

7

random alcohol and drug testing. Mother was ordered to counseling for domestic violence for victims. Father was given monitored two-hour visits, two times per week.

In the combined jurisdiction/disposition report, the department stated the children would remain placed with mother. In a May 9, 2013 interview with the dependency investigator, D.P. said that on the day of the incident, he "saw [his] dad holding a short knife." D.P. also saw a sword hanging on the wall. D.P. saw father "'drunk many times.'" Father did not say anything to D.P. when father was drunk. But, father screamed and yelled at mother. D.P. said, "'I'm a little afraid of him especially when he screams and yells at my mom.'" Father screamed and yelled at mother "'about three times.'" D.P. heard father scream and yell at mother in the office. D.P. denied seeing father throw things around the house. D.P. said, "'I saw my dad drunk driving. One day, he was drunk when he drove me to school. When he came home, he hit the pot which we used to plant things around the house. I sometimes felt sad and scared when I saw my dad screaming and yelling at my mom.'" D.P. said he knew father loved them. Father never hit them. D.P. missed father and wanted father to come home soon.

J.P. said, "'I saw my dad hit my mom three or four times in the bedroom. They argued a lot in the house.'" With respect to the March 2013 incident, J.P. said father drank too much and went to the hospital. J.P. added, "'The judge said daddy must stay outside the house for three months. But I want my dad to come home. I know he loves me. I'm not afraid of him, just [a] little, when he screamed and yelled at my mom.'"

Mother told the dependency investigator that father was not an everyday drinker. Mother used to think father was a social drinker. During their first year of living in the United States, it was okay. Father got drunk once or twice a month. Over the years, father's drinking problems got worse and worse. It took mother more than two years to realize how dangerous father was when he was under the influence. When father was drunk, he cursed at her "'24/7 using, 'F' words.'" Mother said father had a lot of anger. She initially thought it was cultural. As a wife, she needed to submit and not talk back to him when he became argumentative. However, when she felt that her safety and the safety of the children were in jeopardy, she could not be silent anymore.

8

Mother indicated that the incidents where father broke the kitchen faucet with a meat cleaver, threw things around the house and broke the highchair occurred after father had been drinking all night. Father came downstairs asking for a car key to go out with his friends.

Mother said she called 911 after father took the meat cleaver, raised it over his head and threatened to hit her with it. Mother was very afraid. However, she hung up and when the police came to their home, she denied the incident because she did not want father to go to jail. Mother said both children were present when father became verbally abusive to her. Mother said she was going to call 911 in January 2012 when father smashed the cars' windshields with a sledgehammer. But, she did not want father to go to jail. Mother left with the children for three weeks in the summer of 2012 because she did not want the children to be traumatized by father's violent behavior. Father agreed to go to counseling, but shortly afterwards stopped going to see his therapist, Pansy. Father refused mother's request to go to an inpatient treatment facility.

Regarding the incidents that occurred on March 27 and March 28, 2013, mother said father was "so drunk" in the office that when she went to pick up the children from school, she left him in the office. She decided she could not take his drinking anymore and texted him that she wanted a divorce. Father called her 10 times but she did not respond because she did not want to hear him yelling and screaming at her. Father did not come home that night. The next day, mother went into the office after picking up the children. Initially, mother did not bring the children into the office. Mother found father vomiting in the bathroom. Mother said, "'Let's go home.'" Mother then went to bring the children into the office. When they returned, father was extremely drunk and sitting in a chair. A small knife was on the desk and a sword was hanging on the wall. Father said, "'I [would] rather die. Don't put me to shame.'" Mother said she immediately sensed a real danger and took the children back to the car and called 911 because she wanted to get help for him.

The dependency investigator interviewed father on May 8, 2013. Father's English was very limited and his sister, Jessica P., translated for him. Father admitted he had a

few verbal arguments with mother; but, the children were upstairs with a babysitter. Father denied breaking the faucet with a meat cleaver or throwing or breaking the highchair. He said mother was the aggressor during those incidents. Father said he was downstairs cooking breakfast when mother became very angry and began scolding him about business issues. He did not think it was a big deal and did not know why she was so angry. Mother began pushing household items off the kitchen counter. This prompted him to get angry and to start pushing things around. As he walked around the kitchen, he accidently bumped into and knocked down the highchair. But, the highchair was not broken. He did not throw a can of juice at mother. Rather, as he pushed things off of the kitchen counter, he knocked a glass of juice over and the juice splashed out.

On the date he smashed the windshields, father had a business meeting with shareholders. Mother, who did not want him to go, blocked his way and pulled his shirt as he tried to leave. When father told her not to block his way, mother responded, "'If you dare, break the cars.'" Father was so angry because mother provoked him that he took a sledgehammer and started smashing all the windshields. Father said the children were upstairs with Jessica P.

Father said that the March 28, 2013 incident, occurred after he and mother argued about business on March 27, 2013. Mother took the car and left him in the office. Father called mother about 10 times but she would not answer. The following day, mother sent him the text saying she wanted a divorce. He was upset and was also hungry. He went across the street to a gas station and bought a hamburger, some beers and some red wine. Father said about 8:00 p.m., he heard a knock on the door. After a while, mother opened the door. Father was watching a movie. When she asked father if he had seen her text message, he said he did not want to talk about it. The children were in the car parked in front of the office.

Father did not understand why the police came. He could not speak English. Mother accused him of wanting to commit suicide because she saw an antique knife placed on the table for his protection. He explained that in Chinese culture, he believes in "Feng Shui," which is a belief system that placing a knife or important item in a certain

10

position will help protect him "from the evil ones." He also hung a sword on the wall at a certain position. Father denied holding a knife or making gestures as if he would hurt himself. Father said that he was upset about business matters and mother's plan to divorce him. But, he denied trying to take his life or hurt mother or the children. Father said he loved the children and wanted to keep his family together. Father also said, "'I think my wife has plans to destroy our marriage, that's why she was doing this to me.'"

Father reported that, after he was discharged from the hospital, he immediately enrolled in group counseling/domestic violence therapy. He had attended four group sessions. Father was in individual counseling and had completed six sessions. Father was seeing a psychiatrist, Dr. Shih. Father had completed two sessions for his mental health evaluation.

Paternal aunt, Flora P., reported her brother did not want to kill himself or hurt mother and the children as described in the court report. She said father is "'not an alcoholic as described by his wife.'" According to her, father may drink occasionally or socially but does not drink every day. Father is not a violent person. He is a good father. He loves his children and wants to spend time with them. Father and mother had arguments or disagreements on and off like most married couples. Father never hit or threatened to harm mother or the children.

Paternal aunt, Jessica P., said father was a very respectable businessman in China. It was shocking to hear that her brother had been drinking since he was 15 years old. She did not notice him drinking alcohol when they were growing up. Father drinks socially or occasionally but not every day as his wife accused him of doing. She knows her brother very well. He is not violent or mean as his wife described him. He is a good husband and father. About two years ago, she heard father and mother arguing over some business issues. Both of them were responsible for making the mess in the house and breaking the cars' windshields. "'[Her] brother got upset when his wife provoked him.' [She] heard his wife say, 'If you are a man break the car window.'" The children were upstairs with Jessica P. She did not hear her brother threaten to hurt his wife or his children.

11

Jessica P. thought the police and the people at the hospital "misunderstood" her brother. Because he speaks a limited amount of English, he could not defend himself against accusations he was trying to kill himself with a knife. She offered the Feng Shui belief as the explanation for the knife being in the office. She said that he may have been drinking a lot because he was stressed. But, father did not try to hurt himself, his wife, or his children.

Jessica P. monitored a four-hour visit with father and the children. She said the visit went very well. She reported the children were very happy to see father. Father and the children did various activities. Father and the children wanted to spend more time together. Father was appropriate and loving towards the children.

The department attached photographs to the jurisdiction report. Three photographs were of broken car windshields. Five of the photographs were attached to show what appeared to be the kitchen incident, with a cleaver in the sink, the highchair and other items on the floor.

The department filed a last minute information for the court on September 23, 2013, concerning father's progress in programs for parenting, domestic violence, and drug and alcohol abuse. The department also reported father had completed a psychological assessment at Dr. Chao-Ying Wang's office on June 26, 2013. Dr. Wang strongly recommended that father continue to participate in all court ordered programs to resolve case issues. Father was being treated by a psychiatrist, Dr. Shih, for Bipolar I Disorder, most recent episode hypomanic (296.40) and Intermittent Explosive Disorder (312.34). Dr. Shih recommended mood stabilizer medication throughout the treatment but father declined. According to Dr. Shih, father was "capable of engaging [in] meaningful conversation as well as routine daily activities without mood stabilizer. He is free from overall psychotic symptoms. It has been noticed that [father's] symptoms have strongly related to his marital discord. [Father] is motivated in attending treatment and his treatment prognosis is favorable." Dr. Shih recommended father attend individual counseling to address his marital issues.

Father's therapist, Sun Lui, MA, verified father had completed 21 domestic violence sessions, 20 parenting sessions, 3 individual counseling sessions and 25 AA meetings. The therapist reported that father was doing very well in the programs. Father was motivated to learn and to change his inappropriate behaviors and attitudes. She reported that father was eager, open and honest in all the programs. Father was willing to do whatever he needed to reunite with his family. The therapist stated: "'I know that [father ] will not hurt his children. He loves them very much." The therapist opined that father and mother would continue to argue because of many unresolved family, financial and business issues. The therapist "strongly" recommended that the couple start marriage counseling before father be considered to return home.

The department further reported father had negative tests. Father was also seeking spiritual support from his church.

At the disposition hearing, the department rested after the juvenile court admitted into evidence the detention report, the jurisdiction/disposition report and the last minute information. The court then denied father's motion under section 350, subdivision (c), to dismiss the allegation that father has mental and emotional issues.

J.P., who was called by father, testified in chambers that he had seen father hit mother. Father hit mother in J.P.'s bedroom. J.P. opened his eyes a little. He was scared because father was yelling. J.P. had seen father drinking Bud Light. Father would act "very angry" and act mean when he was drunk. Father got angry when he was drunk "every few weeks." Father would yell at mother. J.P. had seen father drunk. J.P. knew father was drunk because father's face would get a little more red and father would talk "weird." When father was drunk, J.P. did not talk to him. J.P. denied that father had ever hurt him in any way. J.P. was not afraid of father. J.P. had seen father driving while drinking. J.P. testified that father drove normally after drinking.

Father also called, D.P., who testified in chambers. D.P. did not see father holding a short knife on the day of the March 2013 incident. Mother told him father had the knife. D.P. did not remember telling the dependency investigator that he saw the knife.

13

D.P. had seen father drinking wine or beer once or twice. He had seen father drunk and knew father was drunk because "[father's] face will turn red or something." Father sounds "grumpier" when he is drunk. D.P. had seen father driving drunk. D.P. could tell by father's face he was drunk. Father was driving "like, bumpy." Father was drunk about four or five times when he drove D.P. to school. Father would yell. D.P. was a "little scared" that father, who was drunk, might crash or something.

When asked if he was afraid of father, D.P. responded, "not all the time." D.P. was afraid of father, "when [father] is really drunk."

D.P. did not remember whether he had ever seen father hit mother. D.P. had never seen father throwing things around the house.

Mother testified that father had not "assaulted" her since April 2013. But, father had threatened her outside the Pomona courthouse "while he was still under a restraining order." Father had written a note to her in Chinese which stated, "'If you continue to expand,'" or something similar "'watch out for your family.'" Mother did not bring the note to the court's attention until after the judge denied the restraining order request because mother was nervous. Mother was subsequently able to obtain a restraining order.

Mother testified that, when father was under the influence, he forced her to have sexual intercourse while the children were in bed with them. Mother would sleep with the children after they no longer had a nanny. A couple of times, mother escaped in the middle of the night. This happened over a couple of years and perhaps more than 10 times.

During the March 2013 incident, father was "very drunk." Father slept overnight at the office. When mother went to pick up father after picking up the children, father was "very, very drunk which was not something out of [the] ordinary." It happened "frequently."

Mother initially went into the office by herself but returned to the car to get the children. She did not want to leave them in the car.

14

Mother said father was motioning up and down from his chest to his stomach, which indicated to her he wanted to commit suicide. Father was not holding the knife but made multiple motions, which was enough to frighten her "and the kids there."

On the day father smashed the cars' windshields, he came home drunk from work. It was a Thursday, which was father's "regular buddy drink night." Because mother knew he was already drunk, she feared father would insist on driving to meet his buddies. Mother offered "very nicely" to drive father. Father said, "'You never obey. I will show you.'" Father then rushed to the garage and began "whamming on the two vehicles." Mother called 911 but hung up after her sister-in-law begged mother to drop the phone. Mother hung up after the sister-in-law said, "'We have no money to bail him out. And he [is] going to be raped in jail."

Mother testified that she was afraid of father, at which point it was noted for the record that mother was crying. She also testified that father had not threatened her since April 2013.

During the kitchen faucet incident, she and father were not arguing. She did not push any items off of the counter. At around 6:30 a.m., mother was cooking and getting the children ready for school. Father was drunk on the couch. He then came into the kitchen and began throwing around items. Out of nowhere, father called her a "pig." Mother said that she usually did not fight back or respond. This time she responded that father was "often drunk" but was interrupted when father threw a can at her. Father then picked up the highchair and threw it. Father went into the kitchen, and threw everything on the island onto the floor, shattering glass. Father picked up a knife, raising it at mother. Mother pulled her shoulder against him and tried to stop him. Her "firmness shook him," which enraged him. He then whacked and broke the kitchen faucet with the knife, which was twisted.

During cross-examination, mother testified that she knew that father's hand motions from his chest to his stomach meant he intended to kill himself because he said it. Father said, "'I want to kill myself.'" Father had made similar statements in the past

15

when he was under the influence. Father said, "'I want to kill myself'" or "'I'd rather die. Don't put me to shame.'"

Father testified that the faucet incident happened six years ago. He and mother were arguing about a matter from the day before concerning business. Father denied breaking the faucet or being drunk. Father did not throw the chair and break it. Rather, the chair was blocking his way out of the kitchen. He was pushing it and it fell to the ground. He spilled milk on the kitchen counter. He never threw anything at mother.

Father was not drunk when he smashed the car windshields with the sledgehammer. He was going out to a business matter. Mother did not want him to go out to talk to his friend. He and mother got into a scuffle. He smashed the windows because mother was blocking his way when he tried to leave. He went to his car and struck it. Mother then said, "'Why don't you smash it so we don't have to go. Nobody would have to go.'" Father was "very sorry for doing that."

In his classes, father had learned how to control his emotions. If he had a problem, he should be calm. Instead of smashing the windshield, father had learned that they "should communicate more and talk more."

Father testified that he drinks about two or three times a month but he does not abuse alcohol. Father denied ever driving the children while he was under the influence of alcohol. He would drink in front of the children but he was not the caretaker. Mother, the nanny or his sister cared for the children.

Father admitted he was drinking on the day of the March 2013 incident. He denied that he was trying to kill himself on that day. He denied ever expressing a desire to kill himself.

Father learned how to take care of and communicate with the children in the parenting classes. In anger management classes, he learned "to respect each other." In a drug and alcohol abuse class, he learned not to drink in front of the children.

Father denied threatening mother at the Pomona courthouse. Father said he did not talk to mother. Mother left the courthouse immediately and was crying when she left the court. Father had no contact with mother since the restraining order was issued.

16

Father received a telephone call from the social worker telling him about the restraining order against him so he stopped contacting mother.

Father denied forcing mother to engage in sexual intercourse. Father denied having thoughts of killing himself. Father testified he was seeing a psychiatrist and had not had any incidents of mood instability since he began seeing the doctor in April 2013. Father testified, "I will continue to talk to this doctor about my mood stabilization and how to–the mood stabilization between husband and wife." Father was not taking any medication.

Father stated the knife that was on his desk was "art decoration." He denied grabbing the knife and motioning that he was going to kill himself.

On cross-examination, father testified that he saw a psychiatrist, Dr. Shih, four times. Dr. Shih told father it was not necessary for father to continue the visits. Father was seeing a psychologist, Dr. Wang, who father had seen 20 times. Father went to Ms. Lui for mood management and domestic violence classes, which were in groups of more than 10 people. Father discussed his mood and drinking with Dr. Wang. Father testified that he did not drink frequently and was "not a drunkard."

Father testified that, "With respect to the mood issue, [mother] does cause the problem." The children's counsel queried, "It is kind of her fault, she did something that caused you to smash the windows in the car, correct?" Father responded, "It is [a] mistake between us. We didn't manage our mood well. It's [a] little my fault."

After argument, the juvenile court stated there was a "great deal" of written and testimonial evidence in the case. The court continued, "The evidence was overwhelming, frankly . . . . [D.P.] and [J.P.] both testified that their father gets drunk. They both testified that his face changes. They both testified that they are afraid of him when he's drunk. They both testified that he yells at their mother. [¶] They love their father, as many children do, despite the parent being a domestic violence perpetrator or alcoholic. They testif[ied] that their father drove when he was drunk."

The court found mother's testimony and statements in the reports to be "very credible." The court found father's testimony was not credible. Although father

17

admitted some things happened, "[h]e put quite a different spin on it." The court noted that father did not admit he had an alcohol problem. The court surmised that father did not even remember many of the incidents because he was so drunk. The court pointed out that, although father was in treatment, he testified that he did not have an alcohol problem. Rather, in father's view, his problems are due to mother, if she "would behave, everything else would fall into place." Father had been diagnosed with mental disorders and had been advised to attend AA meetings. The court stated, "This doctor says that [father] will do whatever it takes to reunify with his family, but that does not appear to be the case to this court. Loving your children and taking responsibility for your actions are two very different things."

The court then sustained the petition as amended under section 300, subdivisions (a) and (b). The court granted the restraining order protecting the mother and children against the father due to the severity of the petition and the longevity of abuse. Father was given monitored visits but paternal aunt Jessica P. could not act as monitor. Father was ordered not to drive the children. The children were declared dependents of the court. The court found there was a substantial danger to their physical health, safety and emotional well-being if they were returned to father's custody. There was no reasonable means to protect the children without removing them from father's physical custody. The children were ordered placed in the home of mother with family maintenance. Father was ordered to complete: 52 weeks of domestic violence classes; a full drug and alcohol program with a 12-step and aftercare program; parenting classes, and individual counseling. Father was also ordered to see a psychiatrist and to comply with all medication prescriptions. Father filed a timely notice of appeal.

## DISCUSSION

### I.  The Jurisdictional Findings

Father asserts the jurisdictional findings are not supported by substantial evidence that the children were presently at a substantial risk of harm due to allegations of *past alcohol abuse and past domestic violence*.

18

The juvenile court's jurisdictional and dispositional findings are reviewed for substantial evidence.  (*In re Mariah T.* (2008) 159 Cal.App.4th 428, 438; *In re P.A.* (2006) 144 Cal.App.4th 1339, 1344.)  "We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence.  Rather, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if other evidence supports a contrary finding.  (*In re James R.* (2009) 176 Cal.App.4th 129, 135; see also *In re Casey D.* (1999) 70 Cal.App.4th 38, 52–53.)

The juvenile court sustained allegations under section 300, subdivisions (a) and (b).  Section 300, subdivision (a) permits the juvenile court to adjudicate a child to be a dependent if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian.  For the purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian which indicate the child is at risk of serious physical harm. . . ."

Section 300, subdivision (b) permits the juvenile court to adjudicate a child as a dependent when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

The primary purpose of dependency statutes is to protect children by safeguarding their physical and emotional well-being.  (§ 300.2; *In re Nolan W.* (2009) 45 Cal.4th

19

1217, 1228; *T.W. v. Superior Court* (2012) 203 Cal.App.4th 30, 42–43.) Section 300.2 states: "Notwithstanding any other provision of law, the purpose of the provisions of this chapter relating to dependent children is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm. This safety, protection, and physical and emotional well-being may include provision of a full array of social and health services to help the child and family and to prevent reabuse of children. The focus shall be on the preservation of the family as well as the safety, protection, and physical and emotional well-being of the child. The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child. Successful participation in a treatment program for substance abuse may be considered in evaluating the home environment. . . ."

There was overwhelming evidence that the children were at risk of substantial injury under section 300, subdivisions (a) and (b). As previously noted, the Legislature has expressly stated that dependency statutes are designed to protect children from the risk of substance abuse and providing a home free of its negative effects is necessary for their physical and emotional well-being. (§ 300.2.)

The record shows father's home was permeated with alcohol abuse and concomitant violence. Mother reported that father had a history of alcohol abuse which got progressively worse during their 10-year marriage. During the 2012 kitchen faucet incident, father was already drunk at 6:30 a.m. as mother cooked breakfast before taking the children to school. When father broke the cars' windshields, father came home from work drunk and wanted to go back out with his friends to drink. During the March 2013 incident, father began drinking on March 27 and continued drinking until March 28 when mother called the police. Mother was told that, after father was taken to the hospital, he had a .300 blood-alcohol level. Mother and both the children testified that when father was drunk, he would start yelling at mother. Both children testified that they were afraid

20

of father when he was drunk. After father would become drunk, he would become enraged and violent and then go on destructive rampages. During the drunken rampages, father destroyed property using a meat cleaver on one occasion and a sledgehammer on a different occasion. During the incident with the meat cleaver, father held the meat cleaver above mother's head in a threatening manner. Father also threw a can at mother after calling her a "pig." During that same incident, father broke the child's highchair. In the incident in March 2013, father had a knife on his desk and was making motions on his chest and stomach which frightened mother enough that she called the police. Father was also being verbally abusive to mother in the children's presence. After the police responded, father was taken by ambulance to a hospital pursuant to Health and Safety Code section 5150. There was also evidence of incidents of father driving the children to and from school while he was drunk.

Father claims he addressed the case issues by participating in various counseling sessions and therapeutic programs. However, successful participation in a treatment program for substance abuse is only a factor to be considered in evaluating the home environment. (§ 300.2.) In any event, the record does not show father successfully participated in any substance abuse program. Rather, the evidence shows father had enrolled in various programs to address case issues. But, as the juvenile court found, father's progress in the programs was questionable. As of the September 2013 adjudication hearing, father was still in denial about his alcohol abuse.

Father was also in denial about how his violent behavior induced by alcohol abuse had brought this family to the court's attention. As the court pointed out, father did not accept responsibility for his own behavior. Instead, father chose to blame mother and accused her of provoking his violent outbursts. In addition to mother's alleged provocation, father claimed that business issues caused his violent outbursts. Father was being treated by a psychiatrist for Bipolar I Disorder, most recent episode hypomanic (296.40) and Intermittent Explosive Disorder (312.34). However, father refused the psychiatrist's advice to take medication to manage his mood swings.

21

Thus, the record depicts a father who has a history of alcohol abuse, which was often accompanied by violent outbursts. Father was in denial about his alcohol abuse and refused to accept responsibility for his own actions. Father had a mental illness and disregarded medical advice on how to control his mood swings. The juvenile court had sufficient evidence to conclude that the past conduct coupled with father's current situation created a current risk of harm that the past conduct would reoccur. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1394, 1396.) There is no merit to the father's claims that the jurisdictional findings are not based on substantial evidence. Father's conduct does indeed place these children at a substantial risk of harm.

Further, we are not persuaded by father's claims that the domestic abuse of mother was in the past so the juvenile court should have ruled differently. Father claims there were "no new incidents of protective concern" after "the alleged threatening-note-passing incident" in April 2013. According to father, his *past* domestic violence against mother did not support a jurisdictional finding at the time of the hearing.

Section 300, subdivisions (a) and (b) support jurisdiction when a child is exposed to a parent's domestic violence. (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 598-599 [section 300, subdivisions (a) and (b)]; *In re Daisy H.* (2011) 192 Cal.App.4th 713, 717 [section 300, subdivision (b)]; *In re Heather A.* (1996) 52 Cal.App.4th 183, 193-194 [section 300, subdivision (a)].) In this case, father has a violent history against mother. Father held a meat cleaver over mother's head in a threatening manner. Father also threw a can at mother. Both children were in the home on that day. Father called mother demeaning names. Father yelled at mother in the children's presence, frightening the children. Father also hit mother in J.P.'s presence. Father forced mother to have sexual intercourse while they were in the bed with the children. Mother testified that sometimes she was able to escape. J.P. said he had seen father hitting mother in his bedroom. J.P. said that he opened his eyes a little on one occasion and saw father hitting mother. Father also had unresolved drinking and mental issues, i.e. denial and refusal to take medication. Father had drunken, violent outbursts where he used sharp instruments to either threaten mother or himself or to destroy property. As of the adjudication hearing, father was still

22

blaming mother for his violent outbursts.  Father threatened mother on the way out of the courthouse after a hearing for a restraining order.  As father concedes, physical violence between a child's parents may support the exercise of jurisdiction under section 300, subdivision (b) where there is evidence the violence is ongoing or likely to continue.  (See *In re Daisy H.*, *supra*, 192 Cal.App.4th at p. 717.)  Thus, the juvenile court had sufficient evidence to conclude that the children are at risk from the domestic violence issues which remain unresolved.

## II.  The Visitation Order

Father also claims the juvenile court should not have ordered monitored visits with the children.  In making the visitation order, the juvenile court must look to the best interests of the child.  (*In re Julie M.* (1999) 69 Cal.App.4th 41, 50–51; *In re John W.* (1996) 41 Cal.App.4th 961, 973–974.)  "While visitation is a key element of reunification, the court must focus on the best interests of the children 'and on the elimination of conditions which led to the juvenile court's finding that the child has suffered, or is at risk of suffering, harm specified in section 300.'"  (*In re Julie M.*, *supra*, 69 Cal.App.4th at p. 50, quoting *In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1376.)  A visitation order determining the best interests of a dependent child may be reversed only upon a clear showing of abuse of discretion.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067; *In re Shawna M.* (1993) 19 Cal.App.4th 1686, 1690.)

The juvenile court acted within its discretion to order monitored visits for father.  There was overwhelming evidence in this case that father posed a risk to the children from unresolved alcohol abuse and mental health issues, including a refusal to take prescribed medication to control his moods.  Father's drunkenness resulted in violent outbursts in the children's presence.  There were at least three instances where father was drunk and then utilized sharp instruments in threatening harm to mother or himself or acted in extremely destructive manners.  Father also drove the children to and from school while he was drunk.  The children were frightened of father when he was drunk saying he became mean and yelled at mother.  Father continued to maintain, however,

that he did not really have an issue with alcohol and that mother and/or business issues caused his drinking or violent behavior. Thus, the evidence showed that father was not likely to change his behavior because he did not really perceive his conduct had precipitated the court's intervention. Under the circumstances, the juvenile court did not abuse its discretion in ordering that father have monitored visits.

## III. The Restraining Order

Father also asserts the juvenile court erroneously included the children in the restraining order. Section 213.5, subdivision (a) gives a juvenile court the authority to grant a restraining order "(1) enjoining any person from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning, including, but not limited to, making annoying telephone calls as described in Section 653m of the Penal Code, destroying the personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the child or any other child in the household; and (2) excluding any person from the dwelling of the person who has care, custody, and control of the child." We review the court's order for sufficient evidence. (*In re C.Q.* (2013) 219 Cal.App.4th 355, 364; *In re Cassandra B.* (2004) 125 Cal.App.4th 199, 210-211; compare *In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1512 [applying both substantial evidence and abuse of discretion].) The juvenile court is authorized to issue a restraining order "if 'failure to make [the order] may jeopardize the safety of the petitioner. . . .'" (*In re B.S.* (2009) 172 Cal.App.4th 183, 194, quoting Fam. Code, § 6340, subd. (a); see also *In re C.Q., supra*, 219 Cal.App.4th at p. 365.)

Substantial evidence supports the juvenile court's determination that without the restraining order the safety of the children might be jeopardized. Father was often drunk in the children's presence. Father engaged in violent behavior against mother in the children's presence. J.P. indicated that father hit mother in J.P.'s bedroom. Father also forced mother to have sex with him while the children were in the same bed. Father drank excessively including having a .300 blood-alcohol level when he was taken to the hospital in March 2013. When father did drink, he could not control his behavior. He

24

engaged in extremely violent conduct when the children were in the home.  Father also indicated that business issues contributed to his violent outbursts.  The juvenile court could reasonably infer that father's unresolved pattern of excessive drinking coupled with his denial issues, refusal to take prescribed medication, and violent outbursts could jeopardize the children's safety.  We cannot conclude that the juvenile court's inferences were not supported by the evidence.  (See *In re B.S., supra*, 172 Cal.App.4th at p. 194.)

## DISPOSITION

The orders are affirmed in all respects.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J. *

FERNS

We concur:


_____, P. J.

BOREN


_____, J.

ASHMANN-GERST


_____

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.